Following Hartford's catastrophic circus fire of July 6, 1944, the fortunes of the circus corporation reached a perilously low point, creating doubt of its ability to rise from its ashes to re-establish itself as a medium of national entertainment. One hundred sixty-nine persons lay dead in morgues; 382 persons lay tortured and suffering with painful, critical and permanent injuries; an additional 112 persons sustained less serious but nonetheless distressing injury; legal actions with attachments aggregating fifteen million dollars appeared to plague circus management; internal factional dissension beset the corporation; several of its officers were under arrest charged with criminal negligence; public confidence in the organization had been shattered; and the corporation's future, viewed from any angle, seemed desperate. *Page 135 
Obviously, this dismal situation demanded prompt and decisive action, which was provided by Judge John H. King, a judge of the Connecticut Superior Court, who, on proper application, appointed Attorney Edward S. Rogin of Hartford as corporation receiver. That temporary designation was made on July 12, 1944; Mr. Rogin was confirmed as permanent receiver on September 15, 1944; he has acted during the intervening years; and he now seeks compensation for his total service, having received no preliminary allowance during his approximate six and one-half years of active participation in the receivership.
Mr. Rogin asks $175,000 as a reasonable fee. The circus corporation, which has obligated itself to pay the item, quarrels violently with this proposed figure, contending that it cannot be substantiated in fact or in law; that it represents a grossly excessive demand; and that the duties of the receiver were largely those of a stakeholder rather than of an active receiver of a going concern.
The order of Judge King of July 12, 1944, provided: "That Edward S. Rogin be and he is hereby appointed temporary receiver of the said Ringling Bros.-Barnum and Bailey Combined Shows, Inc. ___; that said Edward S. Rogin immediately upon taking effect of his said appointment shall proceed to the possession of all the books, papers, evidences of debt and property of said corporation, to collect all monies owing to it, and to take all lawful steps within his power to secure and preserve its assets."
Judge King's order followed the usual pattern in designating a temporary receiver. His language indicates that he was appointing a receiver and not a stakeholder and there can be no question but that a true receivership was intended by all parties and came into being through Mr. Rogin's assignment to and acceptance of his tasks. *Page 136 
While it is apparent that Mr. Rogin became a receiver rather than a stakeholder, he, nonetheless, served as a receiver for limited purposes in that at no time did he act as an operating or liquidating receiver of the business and affairs of the circus corporation. For only two days following his initial appointment did he have possession of any of the physical assets of the circus, an assortment of burned out and otherwise non-operating equipment together with a collection of animals, all of which were returned to the circus by him within forty-eight hours upon the posting of a sufficient bond.
Thereafter his activities, in the main, concerned themselves with the claims of the victims; the arbitration of those claims under conditions and procedure established by an arbitration agreement entered into voluntarily between the circus and the several claimants; the confirmation of the arbitration awards by the Superior Court and the allowance by the receiver of the amount of each judgment entered on the confirmation; the distribution of dividends to the claimants; and energetic exertion to the end that the circus would pay to the receiver its annual net income from operations.
Under the arbitration agreement, which has been referred to, the circus obligated itself not to become insolvent: not to reorganize under the Bankruptcy Act; to turn over to the receiver the full amount of any refunds in income taxes received by it from the bureau of internal revenue; to turn over to the receiver the proceeds of insurance; and, fundamentally, to turn over to the receiver the net profits of its operations. The agreement did not relieve him of responsibility. It imposed on him, as an officer of the court, the added duty of seeing that the terms of the agreement were faithfully observed by the corporation of which he was the duly appointed receiver. *Page 137 
Such accountability involved time, thought, ingenuity, imagination, and effort for which fair and reasonable compensation must be paid.
The months of 1944, immediately succeeding his appointment, constituted an active, time-consuming period for Mr. Rogin, since he was then charting a course for the receivership and since he was navigating in unfamiliar waters made tempestuous by internal conflict within the circus management when stockholders and directors, torn by bitterness and desperation born of disaster, divided into warring factions.
The years 1945 and 1946 were likewise difficult for the receiver, who, while being pressed by distressed claimants, was attempting to steer an even course with management, conscious of the ever-present danger of forced liquidation of the circus with a resultant complete loss of funds with which to pay dividends.
Thereafter, the receiver's problems became less and less complex, less and less burdensome, and less and less time-consuming. By 1947 and during the remaining active years of the receivership, a general design for its conduct had been drawn so that Mr. Rogin was able to discharge his responsibilities without material complications or involvement.
The result of Mr. Rogin's work was singularly successful in that claimants were paid one hundred cents on the dollar with a four million dollar aggregate distribution. To accomplish adequately the purposes of the receivership, Mr. Rogin was required to use his best efforts to the end that neither bankruptcy nor forced liquidation would interfere with operation of the circus. Failure in either respect might have been ruinous both to the claimants and the circus corporation. To assure accomplishment of this task, it became necessary to familiarize himself *Page 138 
with all of the activities of the corporation, its financial operation, its liabilities, its management policies, its intramanagement difficulties, and above all to gather the corporation funds promptly to liquidate the just claims of the luckless victims of the fire. In discharging his obligations as an officer of the court, Mr. Rogin acted with skill and tact, he expended intelligent effort, and he attained highly satisfactory results in the conduct of the receivership.
Mr. Rogin has submitted an elaborate and detailed statement of his doings as receiver and has supplemented that document by oral testimony suggesting the expenditure of approximately 5000 hours in discharging his official duties. I have no question but that Mr. Rogin's evidence has been offered in absolute good faith and with a genuine desire to assist me in arriving at a just result. However, it must be remembered that Mr. Rogin, having lived in close intimacy with this receivership for some six years, cannot be expected to have a completely objective or dispassionate approach to the problem of fixing a reasonable fee for his work.
For example, Mr. Rogin, who was pursuing his profession as a lone practitioner as opposed to being a member of a firm, says that he threw himself into the work of the receivership with enthusiasm and industry to the neglect and detriment of his own private practice. Thus he claims that his official compensation should include, as one of its component parts, an allowance for loss of income from his personal professional pursuits. A close examination of his income, however, does not reflect any such situation but indicates that while he was acting as receiver his income from his private affairs not only did not shrink but actually soared to bring him, from an approximate gross income of $15,000 in 1944, the year of his appointment as receiver, to $22,000 in *Page 139 
1945; $27,000 in 1946; $71,000 in 1947; $66,000 in 1948; $51,000 in 1949; $80,000 in 1950; and $67,000 in 1951.
Surely no individual practitioner of law, however industrious, could devote himself to the work of the receivership as unreservedly as Mr. Rogin contends and yet find the time and opportunity to raise his personal income from a $15,000 level to an average level of $55,000 in each of the active years of the receivership. thus, while Mr. Rogin approaches this matter of fee with sincerity, his thinking, nonetheless, is influenced by an understandable human bias which causes him to magnify the worth of his efforts. Consequently the services of an impartial, unprejudiced judge become necessary to bring the issue into proper perspective.
I have reviewed the entire record with extreme care to find that 2000 hours fairly measure the time reasonably necessary to administer the receivership. Having in mind the responsibility cast upon the receiver, the skill and time expended, the results obtained, and the fidelity with which the tasks were discharged, it is my considered judgment that $60,000 represents a just allowance for Mr. Rogin's services. Such an order may enter.
"It may be said in general terms, that a receiver's compensation should correspond with the degree of business capacity, integrity and responsibility required in the management of the affairs intrusted to him ... such compensation may best be determined, not by a percentage upon his receipts, but by considering the responsibility assumed, the skill and labor expended, and the amounts usually paid for similar services." High, Receivers (4th Ed.) pp. 919-920.
"There is no rule of thumb by which compensation of a receiver and his counsel may be measured but each case must be controlled by its own circumstances *Page 140 
considering such factors as the amount of cash and other assets handled by them, the time and effort they have expended, their ability and effectiveness as officers of the court as indicated by results obtained, the difficulties encountered in conserving and administering the insolvent estate, and the care and fidelity with which the difficulties have been met and surmounted." Bassett v. City Bank Trust Co.,
Superior Court, Hartford County, No. 42658.
 In concluding this memorandum, it will not be amiss, I think, to offer a sincere commendatory word in recognition of the co-operative spirit and effort of circus management through long and trying years. Quick to recognize their deep moral obligation to those who were sacrificed in death or injury, the officers of the circus corporation met their duty four-square, and, insofar as money has been able to assuage grief and discomfort and misery, they have made complete reparation in honorable and forthright fashion.
This laudable spirit of management has been matched by the dignity and exemplary conduct of the legal profession of Hartford County. What might well have been an unseemly, grasping and sordid approach to a dreadful tragedy has been, on the contrary, an exhibition of lawyers at their professional best, acting with restraint and high-mindedness and with a consuming zeal for justice to all concerned. The lawyers of Hartford County have honored their profession. It is a pleasure to pay tribute to them in this public manner.